**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT MARC LEEDS, | No.21-16813 |
| *Petitioner-Appellee,* | D.C. No. 3:15-cv-00261-LRH-CLB |
| v. | |
| PERRY RUSSELL; ATTORNEY GENERAL FOR THE STATE OF NEVADA, | OPINION |
| *Respondents-Appellants.* | |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted April 10, 2023
San Francisco, California

Filed July 26, 2023

Before: Richard A. Paez, Richard R. Clifton, and Holly A. Thomas, Circuit Judges.

Opinion by Judge Paez

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's judgment granting Robert Leeds's 28 U.S.C. § 2254 habeas corpus petition challenging his Nevada first-degree murder conviction for killing William Scarborough.

Although Leeds resided at the house where the murder occurred, the prosecution presented a felony-murder theory at trial, alleging that Leeds committed the murder during the course of a burglary because he entered the home's garage as he struggled with Scarborough.  Leeds's trial counsel failed to argue that a person cannot burglarize his own home. The jury's general verdict form did not specify whether the jury relied on the felony-murder theory or the State's alternative theory of willful, deliberate, and premeditated murder to convict Leeds of first-degree murder.

Leeds sought state habeas relief, but his post-conviction counsel failed to allege in the petition that trial counsel was ineffective for failing to argue that Leeds could not burglarize his own home.  The claim was therefore procedurally defaulted under Nevada law.

Applying *Martinez v. Ryan*, 566 U.S. 1 (2012), the district court excused Leeds's procedural default on the basis of post-conviction counsel's ineffective assistance and the resulting prejudice to Leeds.  The district court then granted relief on the merits of the underlying trial-level ineffective

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

assistance of counsel (IAC) claim, finding that Leeds's trial counsel performed ineffectively under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to raise the burglary argument and prevent the use of the felony-murder theory.

The panel agreed with the district court.

The panel held that Leeds established a basis to excuse the procedural default of his claim because (1) Leeds's trial-counsel IAC claim is substantial and therefore satisfies *Martinez*'s prejudice requirement; and (2) Leeds's post-conviction counsel provided ineffective assistance under *Strickland*, meeting the *Martinez* cause requirement.

The panel held that Leeds is entitled to relief on the merits because (1) trial counsel's failure to raise the objectively important burglary argument constituted deficient performance; and (2) there is a reasonable probability that the result of the proceeding would have been different without the use of the felony-murder rule, such that the deficient performance prejudiced Leeds.

## COUNSEL

Michael J. Bongard (argued), Deputy Attorney General, Office of the Nevada Attorney General; Ely, Nevada; Sheryl Serreze, Deputy Attorney General; Aaron D. Ford, Attorney General of Nevada; Office of the Nevada Attorney General; Carson City, Nevada; for Respondents-Appellants.

Alicia R. Intriago (argued), Assistant Federal Public Defender; Rene L. Valladares, Federal Public Defender, District of Nevada; Federal Public Defender's Office of Las Vegas; Las Vegas, Nevada; for Petitioner-Appellee.

## OPINION

PAEZ, Circuit Judge:

The State of Nevada appeals the grant of Petitioner Robert Leeds's 28 U.S.C. § 2254 petition for a writ of habeas corpus. In 2006, a Nevada jury convicted Leeds of first-degree murder for killing William Scarborough. Although Leeds resided at the house where the murder occurred, the prosecution presented a felony-murder theory at trial, alleging that Leeds committed the murder during the course of a burglary because he entered the home's garage as he struggled with Scarborough. Leeds's trial counsel failed to argue that a person cannot burglarize his own home. The jury's general verdict form did not specify whether the jury relied on the felony-murder theory or the State's alternative theory of willful, deliberate, and premeditated murder to convict Leeds of first-degree murder.

Leeds later sought state habeas relief, but his post-conviction counsel failed to allege in the petition that trial

counsel was ineffective for failing to argue that Leeds could not burglarize his own home. The claim was therefore procedurally defaulted under Nevada law. Leeds then filed a habeas petition in federal district court, which the court ultimately granted. The court, applying *Martinez v. Ryan*, 566 U.S. 1 (2012), first excused Leeds's procedural default on the basis of post-conviction counsel's ineffective assistance and the resulting prejudice to Leeds. The court then granted relief on the merits of the underlying trial-level ineffective assistance of counsel claim, finding that Leeds's trial counsel performed ineffectively under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to raise the burglary argument and prevent the use of the felony-murder theory.

We agree with the district court and affirm. Leeds has established a basis to excuse the procedural default of his claim, and he is further entitled to relief because his trial counsel provided constitutionally ineffective assistance.

## I.

## 1.

Petitioner Robert Leeds and Sally Lane married in 1985. Throughout their marriage, Leeds experienced mental illness, including severe depression and bipolar disorder. In 2000, Lane moved to Canada to attend veterinary school. Leeds moved in with Lane's mother, but he became deeply depressed and fell into a "comatose" state. After he had a falling out with his mother-in-law, he joined his wife in Canada. Four years later, Lane needed money for veterinary school, but her family no longer approved of Leeds. Her brother conditioned his financial assistance on her agreeing to divorce Leeds. Lane filed for divorce in 2004. The divorce became final in April 2005. Leeds and Lane,

however, continued to live together, share a dog and a car, and have a "cooperative" relationship.

Lane graduated from veterinary school in June 2005. At that time, Lane had some concerns about her and Leeds's relationship, but she continued to feel connected to Leeds. The pair decided to move to Las Vegas together, where they leased a home on Evening Song Avenue ("Evening Song house"). Although only Lane's name was on the lease, there was "no doubt" that Leeds would be living there too. Leeds never had a key to the house, but he did not need one because they always left the back door open.

In September 2005, Lane started working at an animal shelter and met William Scarborough, who euthanized animals that had to be put down. Scarborough had been in prison and had recovered from an alcohol and drug addiction. Lane told Leeds about Scarborough, and Leeds cautioned her to keep her distance given Scarborough's job and background. Leeds also worried Lane would begin an emotional affair with Scarborough, as she was "vulnerable" at work because she loved animals and did not like seeing them euthanized. In mid-October, Scarborough and Lane started rescuing some of the animals that were to be euthanized. They became close and started a romantic relationship towards the end of October. Also in October, Lane told Leeds "a couple times" that "it would be better if [they] were separated for a while," but she did not leave him, and he did not move out.

In November, Lane's family planned to visit for Thanksgiving. Because her family was unaware that Leeds was still in her life, Lane told Leeds that they needed to move his belongings out of the Evening Song house and that he could not stay there while her family visited. The "only

purpose" Lane had in asking Leeds to leave for the holiday was that her family not find out she still lived with him. Leeds had started working as an English teacher, so Lane took him to his office "to stay there temporarily," beginning on Wednesday of Thanksgiving week. Shortly before the holiday, Leeds ran out of his psychiatric medications.

Lane spent Thanksgiving with her brother and Scarborough, though her mother ultimately did not visit. The day after Thanksgiving, Scarborough helped Lane buy furniture and move it into the Evening Song house. While they were out to dinner that night, Leeds called Lane's mother and learned that she was not visiting Lane. Leeds went to the Evening Song house around 11 p.m. and let himself in through the back door as usual. Leeds went upstairs, saw the new futon bed, and "lost it" because he "felt [like he] was walking in on a love nest in [his] own house." Around 2 a.m., Lane and Scarborough returned to the house. Lane described Leeds as "devastated" and "hysterical." Leeds also said he was sobbing and felt like he was in a nightmare. Leeds called 911, saying "something to the effect that there is a convicted felon . . . [who] works at my wife's office[] and he has been . . . conning her all along." Lane also called 911 at Scarborough's direction, saying that her ex-husband was in the house.

The police arrived and separated Lane, Scarborough, and Leeds. Lane told police that Leeds was "no longer staying there," "was physically out of the house, but he was . . . not told he couldn't come back," and that Lane was hoping Leeds would find his own place. The police explained that Leeds "had the right to stay because he'd been living there" and that Lane would need to get an eviction notice. Leeds told the police he felt like dying because he was losing his wife, and the police offered to take him back to his office to

"sleep this off." Leeds went to his office, and Scarborough stayed at the Evening Song house with Lane. Leeds called the house twice, but Scarborough answered and said Lane did not want to talk to him.

The next morning, Leeds came to the house and spoke to Lane from the front porch. Leeds told Lane he was sorry for his behavior the night before. He was apologetic. He was holding cash, saying it was for rent. Leeds said he was going to Florida to be with his family and that they could reconcile. Lane was crying and "weakening," and Scarborough told her to "stay strong" in her decision to separate.

Ultimately, Scarborough offered Leeds a ride to the airport, which he accepted. The men got in Scarborough's truck, which was in the driveway. Leeds then asked to hug his dog, to hug Lane, to give Lane the money, to use a cell phone, and to have a drink of water. At some point, Scarborough became frustrated and got out of the truck. Scarborough and Lane went up toward the garage to talk, and Leeds remained near the truck on the phone with his family.

Suddenly, Lane saw Leeds drop the phone and rush toward Scarborough. The two men fell to the ground, struggling, and rolled into the garage. Lane thought Leeds was punching Scarborough, and she started hitting Leeds in the back, trying to make him stop. Lane's hand was injured. She then saw blood on Scarborough's face and saw Leeds holding a knife, which Leeds testified he grabbed from Scarborough. Leeds stabbed Scarborough in the chest and said something to the effect of: "Die like the animals you kill." Scarborough fell to the ground. Leeds then went to the truck, picked up a tire iron, came back, and hit

Scarborough in the head around eight times.[1]  Leeds then left through the gate of the housing community and attempted suicide by cutting his wrists.

**2.**

The State of Nevada charged Leeds with murder with use of a deadly weapon; attempted murder with use of a deadly weapon; battery with use of a deadly weapon resulting in substantial bodily harm; and burglary while in possession of a deadly weapon.  The burglary charge was included because the prosecutor argued that Leeds intended "to assault, batter, or murder" Scarborough when the two men entered the garage during their struggle.  At trial, the jury was instructed that they could convict Leeds of first-degree murder based on either a felony-murder theory (because of the burglary) or a willful, deliberate, and premeditated theory.  In closing argument, the prosecutor explained that it did not matter if the jurors agreed on one theory: they could convict Leeds of first-degree murder as long as they all thought one of the two theories applied.

The jury convicted Leeds on all four counts, although the court later dismissed the battery count.  The verdict form does not specify which theory of murder the jury relied upon to convict Leeds of first-degree murder.  For the first-degree murder count, Leeds was sentenced to twenty years to life, with a consecutive twenty years to life for the use of a deadly weapon.  For the attempted murder count, he was sentenced to six to twenty years, with a consecutive term of six to twenty years for the use of a deadly weapon.  Finally, for the burglary count, Leeds was sentenced to a concurrent term of

---

[1] At trial, a medical examiner testified that the cause of death was the stab wounds to the chest, not the impact of the tire iron.

four to thirteen years.  Leeds appealed his convictions, but the Nevada Supreme Court ultimately affirmed.  *See Leeds v. State*, 281 P.3d 1194 (Nev. 2009) (unpublished table opinion).

**3.**

Leeds then initiated state habeas proceedings.  In Nevada, a post-conviction collateral proceeding is the first opportunity to raise ineffective assistance of counsel claims. *See Gibbons v. State*, 634 P.2d 1214, 1216 (Nev. 1981) (concluding that the "appropriate vehicle for presenting a claim of ineffective assistance of counsel is through post-conviction relief").  Leeds first filed a pro se habeas petition, which was denied.  The Nevada Supreme Court reversed and remanded with instructions to appoint counsel.  In July 2013, Leeds's state-appointed post-conviction counsel ("PCC") filed a supplemental petition alleging multiple errors by trial counsel, but the petition did not include a claim that trial counsel was ineffective for failing to challenge the felony-murder theory on the ground that Leeds could not burglarize his own home (the "burglary theory").  The state district court denied his petition.

Leeds filed a timely appeal to the Nevada Supreme Court in September 2014.  For the first time, PCC asserted the burglary theory, arguing that the felony-murder rule was improperly applied, and citing United States Supreme Court precedent mandating reversal in such situations.  *See Yates v. United States*, 354 U.S. 298, 312 (1957) (a verdict should be set aside "in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).  For support, PCC cited the then-recently decided Nevada Supreme Court case

*State v. White*, 330 P.3d 482 (Nev. July 10, 2014), which made clear that a person cannot burglarize his own home, *id.* at 483. The Nevada Supreme Court, however, affirmed the denial of the habeas petition and explicitly declined to consider the burglary theory because this "ground for relief was not raised in Leeds' post-conviction petition for a writ of habeas corpus or argued in the district court below." Because Leeds failed to raise the burglary theory before the state district court, the claim was procedurally defaulted and was never reviewed by a state court. *See* Nev. Rev. Stat. § 34.810(1)(b).

**4.**

Leeds next filed a petition for habeas relief in federal district court under 28 U.S.C. § 2254. The State filed a motion to dismiss, which was granted in part and denied in part. The parties then briefed the remaining claims. Relevant here is Ground Two, which alleged that "[t]rial counsel was ineffective for failing to challenge the burglary charge and felony murder theory on the ground that Mr. Leeds could not burglarize his own home."

The district court granted habeas relief as to Ground Two in September 2021. It did not address the remaining grounds. The court found that Leeds's procedural default of Ground Two was excused under *Martinez*. The court then addressed the merits of the claim, finding that trial counsel had performed ineffectively under *Strickland*. The State timely appealed.

**II.**

We have jurisdiction under 28 U.S.C. § 2253. Leeds's habeas petition is governed by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254 ("AEDPA").

We review de novo the district court's decision on the habeas petition, including questions of procedural default. *Sexton v. Cozner*, 679 F.3d 1150, 1153 (9th Cir. 2012). We also review de novo claims of ineffective assistance of counsel ("IAC"), which present mixed questions of law and fact. *Rogers v. Dzurenda*, 25 F.4th 1171, 1180 (9th Cir. 2022). Any factual findings made by the district court in evaluating IAC claims are reviewed for clear error. *See id.* Because no state court reviewed Leeds's IAC claim, there is no special deference under AEDPA. *See id.* at 1181.

Where, as here, a petitioner's claim was procedurally defaulted in a state habeas proceeding, he must show that the default was excused in order for federal habeas review to occur. *See Martinez*, 566 U.S. at 9–10 (explaining that federal courts will not review the merits of a claim "that a state court declined to hear because the prisoner failed to abide by a state procedural rule" unless an exception applies). In short, a petitioner can only "obtain federal review of a defaulted claim by showing *cause* for the default and *prejudice* from a violation of federal law." *Id.* at 10 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)) (emphasis added).

## III.

In *Martinez*, the Supreme Court recognized that attorney error can establish cause to excuse procedural default of a trial counsel IAC claim when the state requires a prisoner to raise that claim for the first time in post-conviction proceedings. 566 U.S. at 11–12, 14; *accord Shinn v.*

*Ramirez*, 142 S. Ct. 1718, 1733 (2022).[2]   In states that maintain such a requirement, the state habeas court is the only court that will review the merits of a trial counsel IAC claim.  If a prisoner does not have adequate counsel in the initial habeas proceeding, "[he] will have . . . difficulties vindicating a substantial [IAC] claim," since he will be unable to "rely on a court opinion or the prior work of an attorney addressing that claim." *Martinez*, 566 U.S. at 11–12 (citing *Halbert v. Michigan*, 545 U.S. 605, 619 (2005)). Thus, to protect the prisoner's "right to the effective assistance of counsel at trial," *Martinez* held that an effective attorney is required in these initial-review collateral proceedings, and ineffective assistance by post-conviction counsel can establish cause for default. *Id.* at 12–14.

To show cause under *Martinez*, a petitioner must show that "counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*." *Id.* at 14. The *Strickland* standard requires the petitioner to show that (1) PCC's performance was deficient, and (2) PCC's deficient performance prejudiced the petitioner. *Strickland*, 466 U.S. at 687.  To show prejudice under *Martinez*, "a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14.

---

[2] Although the Supreme Court's recent decision in *Shinn* narrowed the circumstances in which *Martinez* applies, that decision does not impact this case because no new evidence is required to evaluate Leeds's claims. *See Shinn*, 142 S. Ct. at 1734 ("We now hold that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.").

Because a petitioner must demonstrate both cause and prejudice, courts can analyze the two requirements in any order. *See, e.g.*, *Michaels v. Davis*, 51 F.4th 904, 931 (9th Cir. 2022) (addressing prejudice first); *Djerf v. Ryan*, 931 F.3d 870, 880–81 (9th Cir. 2019) (addressing only cause).

"Although the cause and prejudice requirements are distinct, 'there is considerable overlap between these requirements, since each considers the strength and validity of the underlying ineffective assistance claim.'" *Michaels*, 51 F.4th at 931 (quoting *Djerf*, 931 F.3d at 880); *see Dickinson v. Shinn*, 2 F.4th 851, 858 n.3 (9th Cir. 2021) (explaining that evaluating the second *Strickland* prong during the *Martinez* cause analysis necessarily requires some showing of the strength of the underlying trial counsel IAC claim). Notably, the standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying claim. *See Michaels*, 51 F.4th at 930 ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'"). Nonetheless, this "does not diminish the requirement . . . that petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by *post-conviction* counsel [during the *Martinez* cause analysis]." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) (emphasis added), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc).

Only when a federal court has determined that a procedural default is excused under *Martinez* can it turn to the merits of the underlying IAC claim. *See Martinez*, 566

U.S. at 17 ("A finding of cause and prejudice does not entitle the prisoner to habeas relief.  It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted."); *Michaels*, 51 F.4th at 936.

With this framework in mind, we review Leeds's claim.

## IV.

We first address *Martinez*'s prejudice prong to determine whether Leeds's underlying trial counsel IAC claim is substantial.  We then turn back to *Martinez*'s cause prong and evaluate whether Leeds's PCC's failure to raise a trial counsel IAC claim based on the burglary theory constituted ineffective assistance under *Strickland*.  We conclude that Leeds has demonstrated both cause and prejudice, excusing his procedural default.

## A. Leeds's Trial Counsel IAC Claim Is Substantial Under *Martinez*'s Prejudice Requirement

"To establish 'prejudice' under *Martinez*, the underlying trial counsel IAC claim must also be 'a substantial one, which is to say . . . that the claim has some merit.'" *Michaels*, 51 F.4th at 930–31 (quoting *Martinez*, 566 U.S. at 14).  The Supreme Court has said little about the meaning of "substantial," but has cited as analogous the standard for granting a certificate of appealability under 28 U.S.C. § 2253.  *See Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).  For a certificate of appealability to issue, a habeas petitioner must show "that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017) (quotations omitted).  Under that standard, "[a] court should conduct a 'general

assessment of the[] merits,' but should not decline to issue a certificate 'merely because it believes the applicant will not demonstrate an entitlement to relief.'"  *Cook v. Ryan*, 688 F.3d 598, 610 n.13 (9th Cir. 2012) (alteration in original) (quoting *Miller-El*, 537 U.S. at 336–37).

Leeds's underlying claim is that his trial counsel provided ineffective assistance by failing to argue that he could not burglarize his own home, which could have prevented the State from relying on the felony-murder rule as a basis for seeking a first-degree murder conviction.  He argues that if the felony-murder rule had not been available, the State could not have shown beyond a reasonable doubt that he committed a willful, deliberate, and premeditated murder, and that he therefore could not have been convicted of first-degree murder.  When considering whether trial counsel was ineffective, we again use the *Strickland* standard, though we do not apply it as strictly as if we were considering the merits of the claim.  *See Michaels*, 51 F.4th at 930.

## 1.  Trial Counsel Performed Deficiently

Under *Strickland*, "the proper standard for attorney performance is that of reasonably effective assistance."  466 U.S. at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687–88.  This standard means "simply reasonableness under prevailing professional norms."  *Id.* at 688.  That said, because it is easy to second-guess counsel's assistance in hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  We "judge the reasonableness of counsel's

challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

Here, the State argues that Leeds's counsel could not have performed unreasonably by failing to argue in 2006 that a person could not burglarize his own home because the Nevada Supreme Court did not so rule until 2014. *See White*, 330 P.3d at 486. It is true that *White* constituted the first instance in which the court addressed that question, and the reasonableness standard does not require counsel to predict changes in the law. *See Sophanthavong v. Palmateer*, 378 F.3d 859, 870 (9th Cir. 2004) ("*Strickland* does not mandate prescience, only objectively reasonable advice under prevailing professional norms."). But just because the issue was not definitively decided until 2014 does not mean it would have been reasonable for a defense attorney not to make the burglary theory argument before that date. As the Nevada Supreme Court explained in *White*,

> Nevada's burglary statute is subject to two reasonable interpretations: (1) the Legislature intended to revoke the common law rule that burglary requires entry into the building of another, or (2) the Legislature incorporated the common law requirement by failing to expressly include one's own home as a possible place of burglary.

330 P.3d at 484.

Because Nevada's burglary statute was susceptible to two interpretations, a reasonable counsel would have argued for the interpretation that would preclude her client from facing a felony-murder charge. In concluding that "one cannot burglarize his own home so long as he has an absolute

right to enter the home," *id.* at 485–86, the *White* court considered the purposes of common law burglary, the legislative intent of Nevada's burglary statute, and California's approach to the issue. *Id.* at 485. These arguments were available before *White*, and it does not take the benefit of hindsight to realize the obvious strength of the approach.[3]

The Nevada Supreme Court confirmed as much in *Weber v. State*, 132 Nev. 1043, 2016 WL 3524627 (Nev. 2016) (unpublished disposition). There, with an excellent perspective to evaluate professional standards for defense counsel in that state, the Nevada Supreme Court allowed a petitioner to go forward with the claim that his trial counsel was ineffective because he failed to argue that the petitioner could not have burglarized his own home even though the counsel's representation took place before *White* was decided. *Id.* at \*12. The Nevada Supreme Court explained: "As *White* merely articulated the substantive law on burglary as it has always been in Nevada, appellate counsel could have challenged the burglary convictions and felony aggravating circumstance [before *White* was decided]." *Id.*

The burglary theory argument was also not far-fetched. Nevada precedent supported the argument. In 1959, for example, the Nevada Supreme Court explained that while the codification of the Penal Code altered some elements of common law crimes, the "common-law definition of burglary is breaking and entering the dwelling house of

---

[3] Indeed, Leeds's counsel understood that felony murder was easier for the State to prove than premeditation. She argued that the State should not be able to rely on the felony-murder rule, though she did not argue that it was inapplicable because Leeds could not burglarize his own home.

another," and while the legislature can alter a definition, "in legislating on crimes the definitions of which have been so well and commonly understood as the crime[] of burglary . . . , the substitution will not be presumed unless the intention is manifest." *Smith v. First Jud. Dist. Ct.*, 347 P.2d 526, 528–29 (Nev. 1959) (quoting *State v. Petit*, 72 P. 1021, 1022 (1903)). While the Nevada legislature may have "expanded common law burglary in several respects, it has at least retained the notion that . . . one cannot burglarize his own home so long as he has an absolute right to enter the home." *White*, 330 P.3d at 486.

The laws of states with similar burglary statutes also supported the burglary theory argument. In 1975, the California Supreme Court established that a person cannot burglarize his own home. *See People v. Gauze*, 542 P.2d 1365, 1367 (Cal. 1975). The California court considered the California burglary statute, which is nearly identical to Nevada's statute, and concluded that—while there were two reasonable interpretations—the purpose underlying common law burglary (i.e., protection of one's own home from invasion) was not altered by the enactment of the Penal Code. *Id.* at 1366–67. Leeds's counsel could have looked to California's clear law, as the Nevada Supreme Court did in *White*. *See* 330 P.3d at 484–86; *see also Hobbs v. State*, 251 P.3d 177, 179–80 (Nev. 2011) (considering California's caselaw interpreting its battery statute to interpret Nevada's similar statute).

Leeds's counsel was "obliged to make, or at least to evaluate, an argument that [wa]s sufficiently foreshadowed in existing case law." *Bridges v. United States*, 991 F.3d 793, 804 (7th Cir. 2021). Because Nevada law could always have reasonably been interpreted to mean a person could not burglarize his own home (as the Nevada Supreme Court

concluded in *Weber*), competent counsel would have been expected to make that argument.

### 2. Trial Counsel's Deficient Performance Prejudiced Leeds

Because Leeds has made a strong showing that his trial counsel performed deficiently, we next ask whether that deficient performance prejudiced Leeds.  In other words, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.  Here, the State argues that even if Leeds's counsel performed deficiently by failing to raise the burglary theory, Leeds was not prejudiced for two reasons.  First, the State argues that Leeds cannot show that he had an unconditional right to enter the Evening Song house, so he could have burglarized the house and been found guilty of first-degree murder under the felony-murder theory.  Second, the State argues that because there was overwhelming evidence that the murder was willful, deliberate, and premeditated, a jury would have found Leeds guilty of first-degree murder under that theory alone.

We review the district court's factual finding that Leeds had "a right to enter the [Evening Song] home as a joint occupant" for clear error.  *See Earp v. Davis*, 881 F.3d 1135, 1142 (9th Cir. 2018).  The State challenges this finding by arguing that there are three possible times at which Leeds did not have an unconditional right to enter.  First, it argues that Leeds never had an unconditional right to enter the Evening Song house.  Second, it argues that he "moved out of the house on Wednesday," three days before the murder. Third, it argues that after Leeds was escorted off the property by the police on Friday night (twelve hours before the

murder) and voluntarily took his remaining personal belongings, any expectation he had of returning had been extinguished.

All three arguments are unavailing. Leeds clearly lived in the Evening Song house with Lane from the time they moved in. It is true that Leeds was not listed on the lease, did not pay rent, and did not have a key to the house. But while these facts may be relevant considerations, they do not entirely determine whether Leeds had a right to enter the home. *Cf. White*, 330 P.3d at 486 ("[W]hile ownership may be one factor to consider, the appropriate question is whether the alleged burglar has an absolute, unconditional right to enter the home."). Lane testified multiple times that Leeds lived at the house with her, that he did not need a key because the back door was always open, and that it was never their plan for Leeds to pay rent. She never testified that there was any issue with their living arrangements, beyond her few suggestions that he get a place of his own. When Leeds left on Wednesday for the Thanksgiving holiday, both he and Lane understood the situation to be temporary. A temporary exit does not terminate an occupant's absolute right to enter. *See id.* at 486 ("Even though [defendant] orally agreed to stay elsewhere during the week, he still maintained an absolute right to enter the residence.").

Leeds also did not give up his status as an occupant on the night before the murder. Although the State argues Leeds was "escorted off the property by the police" and that he "voluntarily took all of his remaining personal belongings with him," this argument misstates the record. The police told Lane that Leeds had a right to stay at the house because he had been living there and she would need to evict him. Leeds voluntarily went with the police to cool off. Nor did Leeds collect all his property. He took his yoga mat and

laptop, but his other belongings remained at the house and in the garage. The cases on which the State relies to argue Leeds instantaneously gave up his occupancy are inapposite. In both *Sears* and *Ulloa*, the defendants had fully separated from their wives and permanently moved out of the homes in question (for four months in *Ulloa* and for three weeks in *Sears*). *See People v. Sears*, 401 P.2d 938, 944 (Cal. 1965), *overruled on other grounds by People v. Cahill*, 853 P.2d 1037, 1059 n.17 (Cal. 1993); *People v. Ulloa*, 102 Cal. Rptr. 3d 743, 745 (Cal. Ct. App. 2009). Lane and Leeds had never fully separated, and Leeds had never moved out. The district court did not err when it assessed these facts to conclude that Leeds had an unconditional right to enter the Evening Song house.

We next consider the State's argument that there was overwhelming evidence that the murder was willful, deliberate, and premeditated. We review this contention de novo. Although the State presented evidence to support its premeditation theory, Leeds countered this theory by arguing that the case was about manslaughter. His counsel pointed to record evidence suggesting a self-defense or heat-of-passion killing. Because the jury had to reach a unanimous verdict and the evidence towards any single theory was not overwhelming, the district court correctly concluded that a reasonable juror could have believed that Leeds acted in the heat-of-passion or that the State had not proved the premeditation theory beyond a reasonable doubt.

It is thus possible that the outcome of the trial would have been different if trial counsel had raised the burglary theory to preclude the use of the felony-murder rule. Instead, the jury was instructed on both the felony-murder theory and the willful, deliberate, and premeditated theory. In closing argument, the State explicitly told the jury: "You don't have

to agree on the theory. Remember, there's two theories that'll get you to first degree murder in this case." The general verdict form does not tell us which theory each juror relied upon, but we do know that the jury found Leeds guilty of burglary, rendering it possible that at least one juror relied on the felony-murder theory to find him guilty of first-degree murder. Because the verdict must be unanimous, the outcome of Leeds's trial could have been different if only "one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). We find it likely that, if the trial court had declined to instruct the jury on the felony-murder theory, at least one juror may have not been convinced beyond a reasonable doubt that Leeds—distraught after discovering that his partner of twenty years was moving on—committed a willful, deliberate, and premeditated murder.

Leeds has thus shown that his trial counsel IAC claim is substantial. In other words, the claim has "some merit" and therefore satisfies *Martinez*'s prejudice requirement.

## B. Leeds's PCC Provided Ineffective Assistance Under *Strickland*, Meeting the *Martinez* Cause Requirement

To show "cause" for his procedural default, Leeds must demonstrate that, in failing to raise an IAC claim based on trial counsel's failure to assert the burglary theory, PCC was ineffective under the *Strickland* standard. *Martinez*, 566 U.S. at 14. *Strickland* requires Leeds to show that (1) PCC's performance was deficient, and (2) PCC's deficient performance prejudiced Leeds. *Strickland*, 466 U.S. at 687. While we reviewed trial counsel's actions in our *Martinez* prejudice analysis under a more relaxed standard, *see Michaels*, 51 F.4th at 930, we apply the *Strickland* standard

with full force when considering PCC's actions in the *Martinez* cause analysis. *See Clabourne*, 745 F.3d at 377.

### 1. PCC Performed Deficiently

Again, the State argues that Leeds's PCC could not have performed deficiently in 2013 because *White* was not decided until 2014. *See White*, 330 P.3d at 486. For the same reasons we explained above, we reject this argument. Although we evaluate PCC's actions more stringently than we evaluated trial counsel's actions, *see Clabourne*, 745 F.3d at 377, our earlier analysis leads us to conclude that PCC's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. We do not "second-guess counsel's assistance" in hindsight, *id.* at 689, but rather recognize that it was unreasonable not to present an argument that could have prevented the State from relying on the felony-murder theory to obtain a first-degree murder conviction.

As the Nevada Supreme Court explained, "*White* merely articulated the substantive law on burglary as it has always been in Nevada." *Weber*, 2016 WL 3524627, at *12 (explaining that appellate counsel "could have" challenged the burglary conviction before *White*, and PCC might have performed unreasonably by failing to raise an IAC claim on that basis). Just as trial counsel could have made the burglary theory argument in 2006, PCC could have made the argument in 2013 by relying on a common understanding of the definition of "burglary," basic statutory interpretation principles, and the law of other states with similar criminal statutes. The failure to do so was unreasonable. As we noted above, counsel perform deficiently when they fail to "make, or at least to evaluate, an argument that is sufficiently

foreshadowed in existing case law." *Bridges*, 991 F.3d at 804.

While PCC filed a 60-page habeas petition that identified many claims of error at the trial level, the thoroughness of the petition does not negate PCC's failure to recognize a potentially dispositive claim. With felony-murder on the table, the State only had to prove that Leeds committed burglary, a much easier task than proving—beyond a reasonable doubt—that Leeds committed a willful, deliberate, and premeditated murder. Given those stakes, trial counsel provided ineffective assistance by failing to make the burglary theory argument, and PCC performed deficiently by failing to recognize that error. *See Michaels*, 51 F.4th at 934 ("Had PC[C] performed adequately, they would have recognized trial counsel's conduct amounted to ineffective assistance and raised the IAC claim in the first habeas petition.").

As the record shows, PCC did not raise the burglary theory until *White* was decided, although the argument was always available. Given the importance of the burglary theory argument to Leeds's case, counsel's failure was substantial. In short, a "failure to recognize a potentially viable IAC claim is not a strategic decision." *Michaels*, 51 F.4th 935. We therefore affirm the district court's finding that Leeds's PCC performed deficiently because a reasonably competent post-conviction counsel would have recognized the trial counsel's error in failing to advance the burglary theory argument.

## 2. PCC's Deficient Performance Prejudiced Leeds

Having concluded that PCC's performance was deficient, we consider Leeds's argument that this deficient performance prejudiced him, thereby meeting the second

*Strickland* prong and showing cause under *Martinez*. *See Martinez*, 566 U.S. at 14; *Strickland*, 466 U.S. at 691. To show prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Moreover, the "question is not whether the *particular* [post-conviction review] court would have rendered a more favorable decision, but whether some reasonable [post-conviction review] court might have done so." *Michaels*, 51 F.4th at 935 (citing *Apelt*, 878 F.3d 827). Leeds must show that, if PCC had raised an IAC claim based on trial counsel's failure to argue the burglary theory, a reasonable Nevada court could have granted his post-conviction petition.

"Whether PC[C]'s ineffectiveness prejudiced [Leeds] depends in part on the strength of his underlying trial counsel IAC claim, *Djerf*, 931 F.3d at 880, and in part on the use PC[C] could have made of that claim had it been properly raised in the state habeas petition." *Michaels*, 51 F.4th at 935; *see also Dickinson*, 2 F.4th at 858. If the underlying IAC claim were meritless, PCC "would not be ineffective for failure to raise an [IAC] claim with respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d at 1157. As discussed above, Leeds's trial counsel IAC claim is substantial. The underlying claim here is strong, because—since Leeds was found guilty of burglary and the evidence of premeditated murder was not overwhelming—it is likely that some jurors found Leeds guilty of first-degree murder by relying on the felony-murder theory. If the felony-murder theory had not been available to the jurors, Leeds may not have been convicted of first-degree murder

at all. Thus, if trial counsel had recognized and asserted the burglary theory, the outcome of Leeds's trial may have been different.

Given the strength of the underlying claim, it is likely that PCC would have been able to rely on the IAC claim to persuade a post-conviction review court that Leeds was denied effective assistance when his trial counsel failed to assert the burglary theory and thereby allowed the State to prove its case under the easier felony-murder theory. Any reasonable court would have seen the strength of the burglary theory argument and its potential to avoid a first-degree murder conviction. There is thus "a reasonable probability that . . . the result of the [post-conviction] proceeding would have been different" if PCC had not failed to allege an IAC claim based on the burglary theory. *See Strickland*, 466 U.S. at 694. Indeed, the "likelihood of a different result [is] substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (describing the *Strickland* prejudice standard).

In sum, we conclude that it is reasonably probable that a Nevada court would have granted Leeds's post-conviction petition if PCC had properly asserted Ground Two. It is not lost on us that Nevada's Supreme Court has already recognized a willingness to hear such claims. *See Weber*, 2016 WL 3524627. We thus conclude that PCC's failure to assert an IAC claim based on the burglary theory prejudiced Leeds. Leeds has demonstrated that his PCC was ineffective under *Strickland*, meeting *Martinez*'s cause requirement.

Because we conclude that Leeds has demonstrated cause and prejudice under *Martinez*, we affirm the district court's conclusion to excuse the procedural default of Ground Two.

## V.

After the district court concluded that Leeds's procedural default was excused, it reached the merits of Leeds's trial counsel IAC claim. *See Martinez*, 566 U.S. at 17 (explaining that courts consider the merits of a claim only after excusing procedural default). The court applied *Strickland*, concluded that Leeds's claim was successful, and granted habeas relief. It is not entirely clear whether the State challenges the district court's decision on the merits of Leeds's IAC claim. The State's briefing focuses primarily on the district court's finding of prejudice, both during the *Strickland* analysis in the *Martinez* cause prong and in the *Martinez* prejudice analysis. Nonetheless, we construe the State's argument as also challenging the district court's merits determination.

We affirm. To succeed on his IAC claim, Leeds was required to prove: "(1) that his counsel's performance fell below an objective standard of reasonableness (the deficient performance prong); and (2) that there is a reasonable probability of a more favorable outcome if counsel performed effectively (the prejudice prong)." *Rogers*, 25 F.4th at 1181 (citing *Strickland*, 466 U.S. at 687–88). As we have repeatedly discussed above, the burglary argument was always available to counsel. Had counsel raised the burglary argument, it is reasonably probable that the trial court would not have allowed the State to rely on the felony-murder theory as a basis for a first-degree murder conviction. Trial counsel's failure to raise this objectively important argument constituted deficient performance.

We cannot determine whether the jury (or any juror) relied on the felony-murder theory or the willful, deliberate, and premeditated theory to convict Leeds of first-degree murder, but we know the jury found him guilty of burglary.

*See Yates*, 354 U.S. at 312 (a verdict should be set aside "in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected").   It is probable that at least one juror relied on the felony-murder theory.   Because the outcome of the trial would have been different if even "one juror would have struck a different balance," *Wiggins*, 539 U.S. at 537, "there is a reasonable probability that . . . the result of the proceeding would have been different" without the use of the felony-murder rule.   *Strickland*, 466 U.S. at 694.   Trial counsel's deficient performance thus prejudiced Leeds.   The district court therefore did not err in granting him habeas relief.

## VI.

For the foregoing reasons, we affirm the district court's judgment to excuse the procedural default and grant Leeds's habeas petition on the basis of Ground Two.

**AFFIRMED.**